Good morning, John. Karen Larson on behalf of Mr. McDaniels, who is sitting at the bench with me today. It is our position that the Court erred by not allowing Mr. McDaniels to argue the case that he wanted to argue, and that was to present evidence of the spent catalyst concerns at the mobile plant in Long Beach or in Torrance that was creating so many problems. And by eliminating his entire witness list and eliminating the evidence to address safety concerns, Mr. McDaniels was not able to present the case that he wanted to. And that was basically one for retaliation for disclosing and discussing spent catalyst policies and insisting that they accommodate him in a situation. He wanted to return to the area where he had been working, the utilities, and that he could not do so if they did not clear up the problem concerning the spent catalyst test. JUDGE LEBEN I noticed that the District Judge, with just a simple one word, resolves the question as to whether or not there's collateral estoppel arising out of the State Court proceeding. Did you ask the District Judge to give you an explanation? GINSBURG Your Honor, I didn't see that in the record. I wasn't the trial attorney. If I remember, I asked the Associate. I don't know if there was a hearing on the motion, and perhaps Ms. Doty can explain that. I don't remember. KENNEDY In terms of what I see, I've got no explanation as to why the District Judge did what he did on it. GINSBURG That was my same question, Your Honor. I couldn't understand that as to how he found collateral estoppel applying. But even on that issue, I think I've fully briefed and the Court and the panel is obviously much more familiar with the concept of collateral estoppel. Even though we have argued that it didn't apply, even if it did apply in the very narrow aspect, certainly the issue of whether the mobile employers and supervisors were aware of the safety problems and were concerned about re-raising issues in 1997, certainly whether that motivated them was an issue that was relevant that wouldn't even have implicated collateral estoppel. Certainly it was an overlap. Even if we wanted to argue that the State court had made a finding, which it did not, that there was safety, that a mobile didn't violate these statutes. KAGAN Well, the only thing that the State court might have decided, and it would be helpful to me if you could be really specific, is that there wasn't, as to something or other, at least as to whatever caused his injury, the exceptions to the workers' comprehension didn't apply. And I guess the two pertinent ones would be an intent, an intentional act, and a fraudulent concealment. GINSBURG Fraudulent concealment. So is there any way in which those two concepts would, you know, swallow up all the evidence that you wanted to put on? GINSBURG Not at all. I mean, that's basically our position. And, I mean, that's what I argued, being an outsider, looking at it, because I was in the trial, and it just kind of confused me how collateral estoppel could apply, because it seems like such a different issue. KAGAN There might be some things it did apply to. I mean, you're sort of saying that, that if we were to remand and say, well, this was wrong, there still might be some narrow area of collateral estoppel. GINSBURG I'm only arguing that it didn't even make sense to me there, that even if the judge wanted to quickly to – I mean, this is a very – KAGAN What is the answer to that question? GINSBURG The answer to the question for you, your answer, the answer to that question – that very specific question, I can't see in any how collateral estoppel will apply. I mean, the Court very specifically, the State court said, this case cannot proceed because it's barred by the work that's set up. Kagan And no exceptions apply. GINSBURG No, it's – and also on the primary jurisdiction issue. Ms. Doty had – the mobile had very specifically argued on the unfair business practice and the safety on as to whether there were violations there, because the different environmental agencies had primary jurisdiction. So therefore, the State court didn't even address that issue, and there's nothing on the record that would suggest that it did. You only have the motion for summary judgment in the State court, and you only have the order. And nothing on the order would suggest that the Court even considered whether mobile had – spent catalyst policies was a violation. The only point that I was trying to make, that even if you wanted to argue that there was somehow some collateral estoppel because there was some evidence that Mr. McDaniel has complained about those policies, so what? The employers at that time thought that it was very dangerous for employees, including Mr. Graham, the union steward, to be talking about catalysts. There was a policy to limit. Mr. Graham had been disciplined for circulating e-mails talking about spent catalyst policies. The employers could not have known that a State court down the road was going to find them guilty or not liable. So the issue of whether it was on their mind, Mr. McDaniel's and Mr. Graham and Mr. Jacobson all talking about this certainly was a motivating factor. Sotomayor, did you ever make a – offer a proof as to what you would have put on? What is it that you wanted to put on and weren't allowed to put on, in some precision? What happened is the – what we wanted to put on was in all the opposition to the motion for summary judgment in the Federal court. So that when the motion unlimited was filed that repeated the motion for summary judgment, Mr. McDaniel's attorneys repeated their argument that collateral estoppel was not applicable and what evidence – and how it was different. And what was argued in the opposition to the motion unlimited was that the reason why it was – it was more of a technical argument, but certainly the declarations that were filed in my supplemental excerpts and also in Ms. Doty's supplemental excerpts show what was going to be. And I refer – So if we look at the opposition to the motion for summary judgment, we'll know what it is you want to put on. Exactly. And as well as the opposition to the motion limiting. But very specifically, Mr. Jacobson's, in fact – and I know there was a problem because I was asking the court, and forgive me, to just look at the entire file coming up as opposed to including it. So when I did my brief, I didn't – hadn't filed the supplemental excerpts, and I simply referred to the clerk's docket. But in the supplemental excerpts of record volume one and two, particularly volume two, for whatever reasons it's in volume two, you have Donnie McDaniel's declaration with all the exhibits, including the mobile policies saying that when there's spent catalyst in the FCC department, they had to wear spacesuits, almost like – I don't know if you ever watched the show Monk on TV, where he likes – he doesn't want to touch dirt or germs or anything, so he wears a suit. But in Mr. McDaniel's place, they didn't wear these outfits because there wasn't supposed to be spent catalyst in the area. Okay? So that – all of the exhibits to the declarations were very, very important. Mobile, in their excerpts of record, did not include the – all of the exhibits. For example, Mr. Jacobson talks about the letter he sent to the management talking about the history of the spent catalyst and why there was such problems with it and why it was dangerous. I have two questions. First of all, is this – so you're centering on the spent catalyst issue. Yes, Your Honor. One of the things that Mobile says, as I understand it, is that isn't what he was complaining about at the time that he was discharged. So as far as you can make any inference from the timing and so on of a retaliation, that the whole spent catalyst issue isn't pertinent? Well, it was relevant because Mr. McDaniel's whole position was that he couldn't work in the refinery unless he was walking around wearing a respirator mask that wasn't properly outfitted. In terms of what he was threatening to tell Kalosha or wasn't threatening to tell Kalosha. And also they claim they didn't know that he was threatening to tell Kalosha anything at that point. He went in with Mr. Graham in one of the meetings with Mr. Price specifically to talk about all the safety violations. But was he threatening to complain to some other authority at that point? Yes, Your Honor. I believe that's what the record shows, the OSHA violations. All right. And the other question. I have to refer to Mr. McDaniel's. I apologize. Now, if this is a problem, is it a problem with respect to both causes of action or only with regard to the retaliation cause of action? In other words, how would all of this be pertinent to the disability claim? Well, it's pertinent to the disability claim. And this is how I see it. I always thought the disability claim was the weaker claim. I mean, you can see it in my brief. To me, it was the wrongful termination. One, because juries don't like disability claims. He did get workers' comp, didn't he? I think he did get workers' comp. Okay. He got workers' comp. Yes. Is he still getting workers' comp? No. Is he working now? Not in the refinery business, no, Your Honor. What kind of work is he doing? I think he's trying to do some things where he's sponsoring creative artists in the music industry and things of that nature, Your Honor. And he's also running, I believe, a nursing home with his in-laws. But to go back to your question, Your Honor. So therefore, you're essentially saying there really isn't any connection to the disability claim, which is, well, let that one alone? Well, here's the connection. The connection is that at trial, there was a big deal made about Mr. Weintraub saying at the time that he shouldn't be in any area in which a respirator would have to be required. And so on cross-examination, when Mr. Lear wasn't allowed to question the supervisors such as about this whole issue of the spent catalyst, they were simply able to testify, well, I saw Donnie walking around with a respirator and I knew he couldn't be in the utilities area wearing a respirator because his own doctor said it wasn't a problem. And therefore, we couldn't make an accommodation because in order to work in that area, he would have to wear a respirator. And they were arguing back and forth as to whether Dr. Weintraub was saying that was for all future or none. But the real point of the matter was, if Mogul cleaned up the spent catalyst wasn't supposed to be coming out of that area. So if they cleaned up the problem, then he wouldn't have to wear a respirator in the area. And so wouldn't none of the co-employees. And that's where the reasonable accommodation. You've also got on the disability discrimination claim, you've got a pretext question as to say, is there explanation to pretext? And if you can get in evidence that they canned him because of his report of safety violations and threatened of reporting more, that's clearly relevant to your pretext argument. Your Honor, you know my argument better than I do. And I apologize for feeling a little, looking a little disorganized up here. But that's exactly the point. The whole point here is that juries have to hear evidence to conclude pretext. And they just didn't get it. All they got was Donna McDaniel standing up there and being limited from talking about, and nothing supportive of other people. The jury doesn't say, well, why else would they have done it? And the why else is your evidence you couldn't put in. I mean, that's your argument.  And it would have sounded, the Mogul employer sounded very reasonable because they were able to explain, well, he was walking around, we didn't want him wearing the respirator, and they sounded like good guys as opposed to there was this history of trying to hide, they didn't hear the information about other cancer, certain employees dying, nosebleeds, that this had been an ongoing problem since 1997, that there was a limited amount of information being sent. These are all exhibits to the declarations, Your Honor. If we were to rule that the district judge was wrong with regard to collateral estoppel, that wouldn't preclude other evidentiary challenges like just 403 sort of challenges? Because at some point, presumably, the judge could limit how much of this stuff came in. Oh, certainly. But, you know, nothing came in. Even when the Court reserved on the motion limiting number three to see if you could draw a connection as to notice, Mr. Lear wasn't even able, if you look at it, he keeps trying to ask questions about safety violations because the judge said, well, I'll let you talk about safety violations, and then if you can connect it that they were aware of the safety violations and this resulted in the termination. But then Mr. Lear kept saying, but, Your Honor, you're limiting me from saying that, and at one point the judge states, oh, that's right, I see. And he almost like he was able to see that he had made a mistake. But for whatever reason, Judge Hatton seemed to say, I want to move this case along, and by limiting, which I understand judges limiting. I mean, attorneys and witnesses can go on and on ad nauseam, which I apparently am doing right here. But the 10 hours, and it was almost like a clock, and the judge would announce things like you've got seven hours left. And after eviscerating Mr. Lear's case like a week beforehand that you're no longer going to argue what he thought he had preserved in the motion for summary judgment. And, of course, this had nothing to do with it. It wasn't the judge's fault. Mr. Lear just had gotten the case two months earlier. I mean, of course, that's the way it is. But he eviscerated, and then every time he tried to make an argument to tie things in, say you've got eight hours left, you've got seven hours left, it was an impossible situation. And for whatever reason, the judge just didn't want to hear that case. I don't think so. I guess you are. No, I'm not. I mean, and I apologize for that. That's true, but, I mean, sometimes it's interesting to know the equitable argument, and I should have known a little bit more about this. Unfortunately, this is one of those cases where I wasn't the trial attorney, and so, but I think the record is pretty clear as it is. Any other questions? I'd just like to reserve some rebuttal time. Take a break and have a cool glass of water. How did you know that? Good morning. I'm Martha Doty for the defendant in the FLE Mobile Oil Corporation. It's our position on this appeal that this court should affirm the rulings of the district court below and the findings of the jury. I found your brief somewhat mystifying. I mean, you list a whole bunch of things that you say the district court found. Where did you get those from? The only thing we know the district court found was that workers' comp claim was preemptive and some undefined exceptions didn't apply. You have a big list of facts that you say the district court found. Where are you getting that from? Well, that was all the evidence that was submitted both in opposition to the motion in Lemonade to preclude the evidence based on collateral estoppel in Rule 403. So what? I mean, you submit evidence to a district court, to a state court, but if it doesn't decide anything having to do with the evidence because he decides that the cause of action is preemptive, then how can you say he decided those things? Oh, I'm sorry. You said the district court. Do you mean the state court? No, I mean the state court. Okay. The state court. You have a list. You list a set of facts that you say the state court found, and then you list a set of facts that you say were collaterally estopped. But the set of facts that you say the state court found, I don't see any evidence that they found them. Well, I don't think that the state court, in granting the summary judgment, issued a list of the items that it found. But it did round that it went off on. It didn't require it to find those things. Oh, I don't agree with that. Because the mobile's summary judgment motion in the initial action, the toxic tort action, was on the basis that the exceptions to the workers' comp exclusivity rule did not apply, the exceptions being intentional injury and fraudulent concealment. And in order for mobile to establish that it hadn't intentionally injured Mr. McDaniels or fraudulently concealed from him the circumstances of his injury, it had to put in all the evidence that established that it had complied with the law, that it had followed the proper procedures. And that was the evidence that it put in in support of this motion after summary judgment. It could have done it negligently. But the issue in the state court action to determine whether workers' comp exclusivity exceptions applied required mobile to show that it had not – that there were no disputed issues of fact as to whether it had intentionally injured Mr. McDaniels. Okay. So if it complied with everything it did negligently and not intentionally, that could still be the subject of a whole lot of complaints and things that were not clearly established. Well, let me address that. Because the evidence in our case established that Mr. McDaniels didn't complain about those items during his employment. That's a different issue. It is. I agree. But – That's not what the district judge ruled on in the motion on limine. Well, it was part of our – it was part of our motion in limine. We had a 403 section of our motion in limine. But that's what he ruled on. He – it was part of the same motion. He didn't say whether he ruled on collateral estoppel or the 403 issue. He simply said that the motion was granted. But you're arguing collateral estoppel here. We also argued here on this appeal that the district court could just as well have granted our motion on the basis of Rule 403. So you want us to decide the 403 motion now? You can decide that. In fact, it's an easier – What if my view of the 403 motion is that every bit of it comes in? Do you still want me to decide it? Well, we obviously think that the district court could have ruled on either ground and correctly ruled on the collateral estoppel grounds. But as an alternative, he could also have revealed – he could also have ruled on the 403 grounds. But the 403 is subject to a great deal of discretion. That's correct. So – and we have no basis for thinking that he decided that on the 403 grounds. So if we were to decide – we can't decide the 403 motion. As I do know of her, right? The best we could do was decide it deferentially, and we have no basis for thinking he decided that. Well, I don't know why you have any basis for thinking that he ruled on collateral estoppel more than he ruled on the 403 issue, because his order didn't identify whether he ruled based on – Did you ask – I'll ask you the same question. I'll ask you the other side. Did you ask him to clarify? No, we did not. He granted the – he issued his order on the motions in limine. I believe on the Friday afternoon before we started trial. And we started trial on Monday and just – Yeah. Why look at it and just toss it in the mouth? I mean, you won. Don't ask for – don't ask any more questions. We were ready to go. You know, the other thing is that even before we – and I think this supports the argument that he could just as easily or readily have ruled on the 403 issues because at a status conference well before we had filed our collateral estoppel motion in limine, he issued the order on the time limitations. You know, 403 motions tend to be decided – tend to be made and decided sort of piece of evidence by piece of evidence rather than a sort of huge big block. You can't really decide a 403 motion until you understand the – what evidence you have and the context in which it's introduced and all that. Let me ask you that there was a – was there a workers' comp hearing? There was a workers' – there was a very lengthy workers' comp proceeding, yes. Was any of this evidence that you're trying to keep out come in on that workers' comp hearing? The evidence that came in during the workers' comp proceedings went to the extent of Mr. McDaniel's injuries to his lungs. I don't believe that it did. The workers' comp – the record in the workers' comp case, as I recall, involved a deposition of Mr. McDaniel's and a deposition of Mr. White as to the way that the accident occurred. The workers' comp proceeding had to do with the injury to his lungs and not with respect to how the accident had occurred. But I wanted to address – Is there a workers' comp hearing? I believe there is. Workers' comp. I believe there is. It was very difficult to get the workers' comp transcripts. I remember that. I believe there is. I believe there is. But I wanted to – if I could, I wanted to go back and address a point that you just made, which was that ordinarily a court can't – doesn't rule on a block of evidence on a 403 motion and has to know. And I think your point was being made in response to my comment that the court had issued the time limits. I was a trial judge for many, many years, and that's the way I handled it. Okay. But what I wanted to say is that – Well, it wasn't being handled in the abstract. It wasn't. When Judge Hatter issued his ruling that the trial was going to be limited to 20 hours, that was in December of 2003, I believe, following a mediation that we had. And it was after the court had denied our summary judgment motion. And we had filed all of our pretrial memorandum of points and contentions and facts of law. We had – in 2003, we filed all of our trial documents. So when Judge Hatter limited the trial to 20 hours, 10 hours per site, he knew what evidence the plaintiff wanted to put in. He had 290 exhibits. He had 56 witnesses. So I think that you can just as readily decide that Judge Hatter limited the trial and limited the evidence that came in based on a 403. There's no way you can do that. I mean, he may have felt that they had too many exhibits. They didn't need them all. And if he set certain hourly limits, they'd focus on their case. They'd trim it down. They'd put it in such a shape that it could move quickly and be easily understood. So you can't say anything like that. Well, there was a comment that we cited in our brief that Judge Hatter made at that status conference. In the 10 hours, did he indicate that if you could show clear necessity or to show clear necessity that he would consider adding some additional time? I think he did. I think he did. But I want – He also started that limit of hours in the trial court I did. Thank you. I hope it worked. There must have been karma. The point I wanted to make is that at that hearing where Judge Hatter limited the time, we quoted this in our brief. He said, we're not going to have any mini-trials on other people's wrongful termination actions, and we're not going to be revisiting arguments and issues that have already been decided. Now, the latter comment suggests collateral establishment. Well, it has nothing to do with what he's trying to put in. He's not trying to put in anything but other people's wrongful termination. But that's a 403. I think that's a 403 because what Mr. ---- It may be a 403, but it's not a relevant 403 because that isn't the evidence that he's now arguing about. It is. It is. It absolutely is, because the person that he was saying was – had been, quote, unquote, wrongfully terminated was George Graham. He wanted to have George Graham come and testify that after he complained years earlier about spent catalyst, that he was put out in a very remote unit. And that was what the Graham declaration said in opposition to our summary judgment motion. And if that evidence is being excluded as not sufficiently probative, he might have made a mistake on that, too. Well, I don't agree with that because the question on the retaliation claim brought by Mr. McDaniels was, what did Don McDaniels complain about during his employment? He did not complain about Mr. Graham's demotion. Did he complain about spent catalyst? He did not. Never. He never had meetings about spent catalyst. Never did. And, in fact, what the evidence showed was that during his light-duty period, he secretly collected spent catalyst in little dishes, and he never told anyone at Mobile that he was doing it. And then only after he filed his toxic tort action did he reveal that he had secretly  at a lab. He didn't complain. Your position is that there's no evidence that he, during the while he was employed, had anything, any visibility at all in the spent catalyst issue? He did not complain about the spent catalyst issue. Of course, none of this evidence was put in in front of the district court. Well, the district court, not before the jury, not before the jury, but Judge Hattern knew about it. Because what Mr. McDaniels complained about during his employment were actually only a couple things. One, he complained about his physical ailments. Two, he complained about whether the assignments that he was given during his light-duty period complied with his doctor's restrictions. And, three, he may have complained that we failed to get a witness statement from him. Those were his complaints. All of this ---- It sounds to me as though you've got a pretty good argument for the jury when he puts in the evidence he was prevented from putting in the first time around. I think we did. I think ---- Well, I think you do. Not only did, but will have that opportunity. Well ---- I speak only for myself at this point. Well, we believe that the district court ruled properly. What does fail to get a witness statement mean? After the ---- an incident or an accident at the Torrance Refinery, the procedure for the incident investigation was that the incident investigator would collect witness statements from anyone who was directly involved in the accident. And in Mr. McDaniels' case, he ---- the accident occurred on April 2nd. He was then gone from the refinery until almost, I think, until April 23rd. So, of course, the incident investigation takes place almost immediately after the accident occurred. And the accident had nothing to do with Sven Catalyst or any of that? It didn't. It had to do with the breaking of a pipe that vapors came through. It had nothing to do with Sven Catalyst. And what Mr. McDaniels ---- Mr. McDaniels was gone for three weeks, the period during which the incident investigator collected the witness statements. And so they couldn't get one from him. When he returned from work, his supervisor said ---- he went to his supervisor and said, you know what, no one ever asked me for a witness statement. And Mr. Brooks said, you know what, why don't you present one? And he allowed Mr. McDaniels to go home and get his witness statement. And then Mr. McDaniels gave that witness statement to a completely different individual, Mr. Bucklew or Mr. Clemonson, who were the incident investigators, neither of whom Mr. McDaniels had any evidence that they had anything to do with the employment decisions that were made in the case. So he complained that he hadn't been asked for a witness statement, but the evidence at trial showed not only that he was asked for one, but that he put one in and he gave it to someone who had nothing to do with the employment decisions. So he ---- the complaints ---- that's something that I just want to emphasize, is that the evidence that Mr. McDaniels says he was denied from putting in is not evidence that supports any complaints that he made during his employment. These were theories that he developed in his toxic tort case that he filed in March of 2000 after he was already gone. He didn't complain about these things. He gathered all this evidence and filed it. Kagan. This whole discussion doesn't go to collateral estoppel, right? No, it doesn't. It goes to the substantive merits of a retaliation claim. And it may go to a 403 claim. Yes. But it was not a defense which presumably could be raised when you go back, but it But that's right. It's 403 because it shows how prejudicial that evidence is. Because if you don't complain about something and then you try to put in evidence to support a retaliation case that has nothing to do with any complaints you made ---- Did he ever mention 403 when he made a ruling? Well, he issued ---- I didn't ask him.  No, he didn't. We didn't have oral argument, Your Honor. We didn't have oral. He issued the rulings by fax. I have a question. During the ---- During the trial, did he get ---- No. Did he say 403 at any time? He did not. And we referred to that motion in shorthand as the collateral estoppel motion. So during the trial, when the objections were raised, there was never any ---- nobody ever said, oh, remember that collateral estoppel motion? No. But that is exactly ---- Nobody ever said it's ----  During trial, it was referred to as a collateral estoppel determination. It was. So it was. So therefore, that's the end of it, no? No, it's not, because that was just the shorthand. I mean, when ---- It was just ---- It was just our shorthand for it. I mean, I suppose we could ---- I could have stood up and said, objection, Your Honor, that's barred by the collateral estoppel and 403 motion. But things were happening at a rapid pace, as you can imagine, under the time limit, so we just used the shorthand version. The consequences are entirely different, and the determination at a particular objection might be different, depending on whether it was a collateral estoppel determination or a 403 determination. Well, I don't ---- I don't agree with that, because I think that ---- But, I mean, I've read parts of the transcript where these collateral estoppel objections are made. I have to say they sound like collateral estoppel objections. They do not sound like balancing 403 objections. It's just, boom, out. The judge says, yep, out. Well, well, that may be. That may be. But, again, the ---- when those objections were raised, for instance, Ms. Larson argued that Mr. Lear was not able to go down lines of questioning. Okay. Well, our view is, and one of the reasons why ---- Or put it another way, the one thing you haven't stood up here and argued very much is that the collateral estoppel determination was correct. And if you have any way to tell us why it might have been, that might be helpful. Oh, absolutely. I mean, I believe that the collateral estoppel determination meets all of the elements of the collateral estoppel rule. First, the issues were identical in the toxic tort case. But they weren't because they only ---- the question isn't the issues. The question is what was decided, right? Right. And what was decided was that workers' comp exclusivity applied because the exceptions that Mr. McDaniels had filed his claim under had not been established. Because it wasn't intentional, which is not relevant to the question of whether he complained about something that was going on in the plant. It could have been complained about something that wasn't intentional. And because there was no ---- this fraudulent concealment thing, which is very narrow and basically says there has to be fraudulent concealment of that particular person's particular injury and that has to have exacerbated his damages. And, you know, he could have decided that it didn't exacerbate the damages and that would have nothing to do with anything. So we can't tell whether he decided that it wasn't fraudulent as opposed to it didn't exacerbate the damages. And we can't tell that he decided it didn't happen as opposed to it wasn't intentional. So there's no way to determine that from the determination that the exceptions didn't apply that there wasn't things going on in that plant with spent catalysts that people were complaining about. Well, there is no record of any hearing. But the evidence that was before the state court, which was the evidence that was submitted by Mobile, specifically demonstrated that Mobile did not intentionally injure or fraudulently conceal. But Judge Bergeon's point, with which I agree, is that evidence and a determination as to the evidence that you're now referring to was not necessary to its decision. And it doesn't explain anything. It just says none of the exclusions apply. This is covered under workers' comp. That's all you get. And the points that you now seek to establish were not necessary to its decision. I mean, boom, boom. End of argument. Well, it seems to me that they were necessary to the state court's decision in the first case because he could not have ruled that we didn't intentionally injure Mr. McDaniels or that we didn't fraudulently conceal the injury from us. But he could have decided, as I said, first of all, in the fraudulent concealment, he didn't even have to decide that he didn't fraudulently conceal. He could have just decided that it didn't exacerbate his injuries. So on that, it seems to me you're totally out because there was no necessary determination with regard to the fraudulent, even the fraudulent concealment. And as to the do you have any response to that? Well, no, no. That's fine. But as to whether we intentionally injured him. Let's assume he decided you didn't intentionally injure him.  Well, all he decided was a state of mind. In other words, he didn't decide objective facts. He had no reason to decide objective facts. Well, it seems to me that in order for him to determine the evidence that came in, on whether we intentionally injured Mr. McDaniels, went to whether we had run the plant beyond the environmental regulations, whether we had ignored complaints about spent catalysts, whether there was a nosebleed incident, whether that was caused by the spent catalysts. None of which requires proving that you did anything intentionally, as opposed to negligently, recklessly or otherwise without due care. All right. I see the point that you're making. In other words, the trial court and the state court action, you're saying, determined – simply determined that the intentional injury component of the exception. Right. Half of the things didn't happen, but they didn't happen intentionally. Well, it had to decide. Well, it seems to me that the evidence that was submitted in support of the summary judgment motion, he didn't necessarily have to decide that, but he – but it was there that there were neither intentional nor negligent noncompliance. And I will add, just in case it becomes relevant, if you decide to advance the collateral estoppel argument below again, intent with respect to workers' comp exclusion may have a different definition of intent with respect to whether or not I intend to allow spent catalysts to build up and so on. Well, the – There are various ways of deciding intent, and intent with respect to the exclusion for workers' comp has a very specific definition. Well, that's fine. I understand the points that you're making, and it seems to me that the argument, if the Court were to remand, it would be that Mr. McDaniels did not complain about these matters, that these were his theories that he held. Sorry. That goes to the 403 issue, which may be – Or the merits. That's right. But the 403 issue was before Judge Hatter, and it was fully briefed, and it was by both sides. And was not actually unnecessarily decided by Judge Hatter. Just to repeat the formula for collateral estoppel. Let me ask you a question. How did that 10 hours work out? It was fantastic. It was absolutely fantastic. Well, it was a battle to get it in, but I thought it worked. If 10 hours didn't happen, then sometimes it is to say in 10 hours that it did. That's right. I think it was – You can review the whole history of the Civil War in 10 hours. You don't have to present the information. Otherwise, the lawyers go on and on, and the jury is starting to nod off. I heard that. If I could just make one final point, and I will keep it very brief. It relates to the strength of the evidence on the disability discrimination claim. And we devoted a great deal of attention to that in our brief for a reason, because we wanted to put his termination in context. At the conclusion of Mr. McDaniel's leave or light-duty work period while his injury was going from influx to permanent, his doctor issued a very severe and stringent restriction that said that he could not be exposed to any gases, dust, odors, heat, cold, humidity. And that was the basis of the decision to end his employment. Would he have worn a respirator? He could not have worn a respirator, because there was actually testimony from Dr. Scannell that the respirator would not have prevented all exposures, because there were times when you have to lift up in an emergency. You may have to lift your respirator to talk on your walkie-talkie. So we could not guarantee that he would never be exposed to any gases, dust, or odors. We simply couldn't do that. And that was the reason for the decision to end his employment. We could not reasonably accommodate the very stringent requirements that Dr. Weintraub placed on him. And we noted this in our brief, and we said that even that Dr. Weintraub never came back to Mogul and said, I think you've misinterpreted my restrictions. I never meant for this man to not be able to work in the refinery.  Did your people have conversations with Dr. Weintraub? It did. Dr. Gene had several conversations, and there was testimony at trial on that. He talked to him several times and exchanged correspondence with him. There was a great deal of interaction. And Dr. Gene said, are you sure that it has to be this strict? Yes. Because, Dr. Gene, we excerpted this testimony. He was really impacted by the fact that this man might lose his job because of the strictness of that restriction. And so he gave great consideration to whether that was what Dr. Weintraub really meant by it. Thank you. Thank you. Well, with you two squaring off, you're pretty light. Well, Your Honor, I was feeling originally kind of badly that I normally, on an appeal, I'm the attorney. You feel bad, not bad. Oh, bad. Okay. But I think that Ms. Doty's recollection of what occurred is an exact, and, in fact, you stole my thunder on the collateral estoppel. It is clear that every time she made an argument. I stole your thunder. You got a lot left. Okay. I hate to say this, Your Honor, but you remind me of my dad. You from New York, too? I'm from Los Angeles. Okay. He used to say the same thing. He didn't cut us short. We had six kids. We had about five minutes to complain about anything, and that was it. Next. But as far as the collateral estoppel argument. You don't seem to learn a lesson. Well, Your Honor, I'm talking real fast. I could do all those witnesses in ten hours. The question is that sometimes, as one of my colleagues said in an appellate advocacy seminar recently, the biggest thing one learns is one to keep quiet. Okay. So I was just going to remind you that she the word arguments and collateral estoppel. And just one point. Mr. Bode did, in the middle of an argument, on page 35 of the trial testimony of October 26th, he was asked, did he make complaints referring to Mr. McDonnell about catalyst dust? I asked him why he was wearing the respirator, and he said the dust was bothering him, so I didn't assume that was a complaint. That was a response to a question. What catalyst dust? Ms. Doty, objection. It's barred by the collateral estoppel motion. It's sustained. So the point that he wasn't complaining at the time on the 403 issue, which, of course, the Court didn't rule on anyway, it he was talking about that when Mr. Lear You're saying that that was also excluded on collateral estoppel grounds, so we don't know whether he was complaining at the time. Exactly. He was stopped from discussing that. But the point that she's trying to make that, oh, he never complained at the time. When Mr. Lear tried to bring that up, he was stopped from talking about it. Mr. McDaniels, same argument, collateral estoppel, he was not allowed to talk about any of his safety complaints concerning the spent catalyst. And also, Your Honor, as far as the issues on the respirator, Dr. Weintraub and everyone that testified, he had additional doctors. The doctor they presented conflicted their own doctor, Dr. Friedman, who talked about, yes, he could have worked with the respirator as long as the respirator was fitted, but the point is nobody was supposed to be wearing a respirator. In other words, they wanted to put him back in a condition that wasn't safe for anyone. But that's an issue for the jury to decide. Thank you, Your Honor. All right. When did your father die? Your Honor, my father died a couple years ago in the middle of one of my trials. So, yeah, he was a pretty cool guy. All right. How about Koldell v. Leavitt? All right.
judges: Pregerson, W. Fletcher, Berzon